THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RALPH A. VICKERY, Defendant-Appellant.

(No. 11456;

Fourth District—August 27, 1971.

*Rehearing denied October 5, 1971.*

John E. Gambill, of Rantoul, (James Blunk, Senior Law Student, of counsel,) for appellant.

Lawrence E. Johnson, State's Attorney, of Urbana, (Kenneth E. Baughman, of counsel,) for the People.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

Defendant, Ralph A. Vickery, was convicted on a plea of guilty of involuntary manslaughter, was denied probation and sentenced for an indeterminate term of three to ten years.

Defendant's brief states the sole issue presented by this appeal to be "Whether the defendant is entitled to a new probationary hearing because the trial judge abused his discretion in deciding the issue of probation on his own preconceptions and predilections which precluded a fair consideration of the petition on its merits".

The acts committed by the defendant, which resulted in his indictment and conviction were these: he beat to death a ten year old child, his stepson, Charles Shupaek.

Defendant's family consisted of his wife, who had been previously married, three stepchildren who were Charles (the victim), Candace, age eight, Chris, age six, and his own son, Robbie, an infant, the only child of defendant and his wife.

The incident which gave rise to defendant's conviction occurred on May 25, 1970. Defendant and his wife had left the children with a baby sitter and on their return Charles was accused of eating some jello from a bowl in the refrigerator. While Mrs. Vickery was engaged in a telephone conversation with a friend, one Antoinette Barren, the defendant began to punish Charles who had apparently denied eating the jello. The lad then offered to tell defendant the truth, about the jello if he would cease the punishment. Defendant testified he felt the boy was trying to "bargain" with him and began to beat the boy's head on the floor. This was done with sufficient violence to be audible to Mrs. Barren on the other end of the telephone line. She testified that it sounded like "* * * a kid with a ball and bouncing it but not rapidly. Just, you know, just slow."

The defendant and his family lived in a mobile home. A neighbor, Mrs. Karen White, lived in a mobile home some fifteen feet distant. On the day in question her windows were closed and she too, heard the "* * * loud, thumping noise."

Defendant's wife left the telephone when the violence erupted and saw Charles on the floor unconscious and bleeding. Defendant picked the child up by the hair and said that there was nothing wrong with him, "* * * he's just kidding". The child died later of head injuries.

The other children saw the beating and defendant stated to the six-year-old, Chris, that he might get a taste of what Charles had gotten.

Defendant and his wife told the doctor at the hospital when Charles was taken that the child had had a temper tantrum and bumped his head on the floor.

There is an abundance of credible evidence in this record that the defendant had, for several years, been guilty of a persistent pattern of child abuse, of administering physical punishment on helpless children far in excess of civilized standards. It takes a strong stomach to read this record in its entirety.

At one time defendant was possessed of a wooden paddle with which he whipped the children, and on one occasion bruised the child Chris, then aged five, so badly about the kidneys that he was hospitalized. Thereafter, defendant testified, he changed his method of punishment and would have the child bare its buttocks and bend over a piece of furniture. He felt that the paddle was "*   *   *   a symbol of authority." On some occasions he would have the other children watch while punishment was being administered.

It is also clear from the record that on one occasion he administered a severe burn to the thumb of the child Chris, in an effort to cure him of sucking his thumb.

On at least one prior instance a doctor had suspected child abuse when one of the children was taken to the hospital.

The wife testified that she had once had to threaten their own child, Rob, in order to make defendant desist from punishment of one of his stepchildren, saying, "Uh, the incident that I think you are talking about is one time when Allen was mad and was correcting one of the children, and I told him to stop. And he said, uh—he acted like he didn't hear me or anything. And I called him several times. And so I said, well, if you're —if you're going to—if you're going to be that hard, I said I'll just go and get Rob. And he quit then because he saw what—you know, I got his attention."

It is against this background that defendant selects two particular remarks of the trial judge as demonstrating that the decision to deny probation was based on "*   *   *   his preconceptions and predilections" and thus seeks to establish an abuse of discretion.

Three co-workers of defendant had testified that defendant, at work, had never shown any evidence of temper and violence. In his comments, made at the time of ruling on the Petition for Probation, the judge referred to this testimony and said, "Certainly there must have been some evidence of something when this particular act was committed." Defendant then argues that the judge "*   *   *   *ignoring* this testimony *assumed*

that there was evidence of a temper and violence" as demonstrated by his remarks.

This argument barely deserves comment. How it would advance defendant's cause to convince us that beating a helpless child to death, while in a calm reflective state of mind, is a proposition which escapes us.

Defendant also states that there "*  *  * was no evidence of prior explosive episodes or evidence of temper."

Attached to the report of the probation officer, and therefore before the judge at the time he made his decision to deny probation, were the reports of several psychiatrists and psychologists. Doctor Clifton Rhead, in his report of his interview with the defendant, stated that the defendant, at the time of the incident in question, "*  *  * recalled becoming angrier when he felt that the boy was trying to 'make a deal' with him."

The report of Doctor Eisen described the defendant as having "*  *  * little or no ability to deal with the emotional tensions of everyday living. Under such pressure he is likely to explode into violent behavior", and Doctor Eisen further felt that the defendant was not "*  *  * capable of a warm meaningful relationship with others", and that he had "the potential for psychotic-like rage reactions."

Doctor Greenfield said that during his interview the defendant stated that "I lost control, hit him over the head and face and he didn't move."

This evidence hardly squares with defendant's claim that there "*  *  * was no evidence of prior explosive episodes or evidence of temper".

Defendant also complains that when deciding on a date for hearing in aggravation and mitigation, the trial judge "*  *  * showed his feeling toward the possibility of defendant receiving probation when he said: 'I suppose should he by some chance get probation that would be a more or less moot situation.'" The defendant argues that this clearly demonstrates that the judge had already made up his mind on the issue of probation before the hearing was had.

It should be noted that defendant had just entered his plea of guilty, and we place this remark in context by quoting from the record:

"MR. GAMBILL: Your Honor, we would like to have a hearing in aggravation and mitigation. It will be some time now because there is much work to be done, some witnesses to come back from Texas. I have some psychological and psychiatric testimony that I intend to introduce at that time. To expedite matters my client and I will agree that Mr. Johnson can have his psychiatrist talk to the defendant at any time, so he is not taken by surprise and all the testimony can be placed in at one time. Further we intend to make a motion for pro-

bation. We have no objection at any time to any members of the probation office going to the jail to interview the defendant.

THE COURT: Show a motion of the defendant to be admitted to probation. The motion is referred to the Probation Officer of this Court for investigation and report. The cause is continued—.

MR. GAMBILL: Your Honor, can we have thirty days on this?

THE COURT: All right—to June 25th, 1970 for said report. I don't know what you want to do about a hearing in mitigation and aggravation. I suppose should he by some chance get probation that would be more or less a moot situation. Do you want it set the same day?"

Taken in context, it seems again, that this is an unwarranted allegation. It could be argued, for example, that the request for hearing on aggravation and mitigation, made by defendant's counsel *prior* to indicating that a petition for probation was to be filed, would indicate a tacit concession that probation was an unlikely prospect, and this his representation of defendant was therefore subject to criticism. This accusation would be as valid as that made by defendant against the trial judge. A reading of the entire record refutes both propositions. Defendant was ably represented, and there is nothing in the record to indicate anything but a fair resolution of the issue with reference to probation. The trial judge heard ten witnesses testify on the issue, considered the report of the probation officer, and all of the psychiatric and psychological reports attached thereto, reserved ruling to consider the matter. That he did in fact carefully, conscientiously review and weigh the record before him, is irrefutably established by the statement which he made in denying the petition. That statement covers some eight to ten pages of the record and sets forth reasons, and in our view, an entirely adequate basis for his ruling. It should also be noted that the State's Attorney recommended a sentence of seven to ten years which the trial judge refused to adopt, and imposed sentence as above indicated.

The granting or denying of an application for probation rests within the discretion of the trial court and we will not disturb the ruling of the trial court when that court has exercised its discretion (*People v. Pelikan,* 6 Ill.2d 275, 277, 128 N.E.2d 741), unless that discretion is abused. (*People v. Sims,* 32 Ill.2d 591, 596, 208 N.E.2d 569.) Here, it is abundantly clear that the trial judge did exercise his discretion, and it is equally clear that he did not abuse it. This appeal is without merit.

Judgment affirmed.

SMITH, P. J. and TRAPP, J., concur.